UNITED STATES of America, Appellee,

v.

Charles L. WYNN, Jr., Appellant.

No. 92–3024.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1995.

Decided Aug. 1, 1995.

As Amended Oct. 4, 1995.

W. Gregory Spencer, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs, argued the cause for appellant.

James W. Cooper, Asst. U.S. Atty., Washington, DC, argued the cause pro hac vice for appellee. On the brief for appellee were Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, DC. Elizabeth Trosman and Eileen C. Mayer, Asst. U.S. Attys., Washington, DC, entered appearances for appellee.

Before BUCKLEY, RANDOLPH, and TATEL, Circuit Judges.

BUCKLEY, Circuit Judge:

Charles Wynn was convicted of 34 counts of money laundering and related offenses following a three-week jury trial in the United States District Court for the District of Columbia. On appeal, he challenges the sufficiency of the evidence against him. For the reasons described below, we affirm 32 of Wynn's convictions but reverse his two convictions for illegally structuring financial transactions, in violation of 31 U.S.C. § 5324(a)(3), because the Government failed to offer any evidence to support one essential element of that crime.

## I. BACKGROUND

The majority of the charges against Wynn stemmed from his operation and co-ownership of Linea Pitti, an exclusive Washington, D.C., retail store specializing in expensive Italian men's clothing. Linea Pitti's two best customers were Rayful Edmond III and Tony Lewis. The two made cash purchases totaling more than $457,000 from the store in 1987 and 1988, accounting for more than 25 percent of Linea Pitti's gross sales in fiscal year 1988. Wynn served as their primary salesman. Edmond and Lewis commonly purchased large quantities of merchandise at one time and later paid for those purchases in relatively small installments. At trial, the Government presented evidence, which Wynn does not dispute, that Edmond and Lewis operated a large-scale, illegal narcotics trafficking operation in the District of Columbia during this same period. *See United States v. Edmond,* 52 F.3d 1080, 1084–86 (D.C.Cir.1995).

In May 1989, a federal grand jury indicted Wynn on 54 counts of laundering the proceeds of illegal activities, in violation of 18 U.S.C. § 1956, based upon 54 separate payments allegedly made by Edmond and Lewis to Linea Pitti. The indictment alleged that Wynn knew that Edmond's and Lewis's money was obtained illegally and that he knew the drug traffickers purchased his merchandise in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the currency. The jury found Wynn guilty of 24 of the counts and not guilty of the remaining 30. The indictment also charged Wynn with three counts of engaging in financial transactions involving

$10,000 or more of criminally derived proceeds, in violation of 18 U.S.C. § 1957, based on three bank deposits made by Linea Pitti that matched the amounts of three payments Edmond or Lewis had made to the store. The jury found Wynn guilty on one of these counts.

Most of the remaining convictions stemmed from Wynn's purchase of two expensive automobiles on behalf of Lewis. In December 1987, Wynn purchased four cashier's checks from banks, each in a denomination of less than $10,000, and used them to pay for a Range Rover automobile for Lewis. In January 1988, Wynn bought two additional cashier's checks, which he paid toward the purchase of another Range Rover for Lewis. Based on these transactions, the Government charged and the jury convicted Wynn of six additional counts of money laundering (one count for each cashier's check), in violation of 18 U.S.C. § 1956.

In connection with the first Range Rover purchase, the indictment also charged Wynn with one count of structuring a financial transaction to evade the requirement that banks report to the Government cash transactions of $10,000 or more, in violation of 31 U.S.C. § 5324. In April 1988, Wynn paid off the $25,000 balance on a bank loan with three cashier's checks, each for less than $10,000. At least two of these were purchased with cash. Based on this transaction, which the Government does not allege involved Lewis or Edmond, the indictment charged Wynn with a second violation of section 5324. The jury convicted Wynn of both counts.

In addition, the jury found Wynn guilty of one count of conspiring to violate 18 U.S.C. § 1956, 18 U.S.C. § 1957, 31 U.S.C. § 5324, and 18 U.S.C. § 1503 (obstruction of justice), but acquitted him of the charge of obstructing justice by impeding the grand jury's investigatory efforts, in violation of section 1503.

The district court sentenced Wynn to a total of 57 months in jail, with some of the 34 sentences running concurrently and others consecutively. In addition, it imposed special assessments of $25 for one of the section 5324 convictions and $50 for each of the other 33 convictions and required Wynn to serve three years of supervised release following his prison term. Wynn challenges the sufficiency of the evidence that underlies all 34 convictions.

## II. ANALYSIS

### A. Standard of Review

When reviewing a guilty verdict for sufficiency of the evidence, we view the evidence in the light most favorable to the Government and must affirm the verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We do not act as a "second jury weighing the evidence anew," *United States v. Poston*, 902 F.2d 90, 94 (D.C.Cir.1990), nor do we require that the evidence "exclude all reasonable hypotheses of innocence or lead inexorably to the conclusion that the defendant is guilty." *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C.Cir.1993). We require, however, that a jury's verdict be based upon more than "mere speculation." *Id.* (internal quotation marks omitted).

### B. Money Laundering Charges

Wynn was convicted on 30 counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (1988). That statute provides, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

. . . . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .

. . . . .

shall be sentenced. . . .

*Id.* In applying the statute to this case, the Government was required to prove four elements in order to convict Wynn of any given count: (1) that Wynn conducted or attempted to conduct a financial transaction, (2) that the transaction involved the proceeds of a statutorily specified unlawful activity, (3) that Wynn knew the proceeds were from some form of illegal activity, and (4) that Wynn knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. It is undisputed that all of the transactions underlying the section 1956 charges constituted "financial transactions" and that narcotics trafficking is a statutorily defined "specified unlawful activity." *See* 18 U.S.C. § 1956(c)(7)(B) (1988).

### 1. The Linea Pitti transactions

Wynn's challenge to the sufficiency of the Government's proof concerning the Linea Pitti clothing sales charges focuses on the statute's two *scienter* requirements. He contends that the Government presented no evidence that he knew Edmond and Lewis earned their income through drug distribution; and further, because the purchases were handled as ordinary commercial transactions, there is no evidence that he knew they were designed to conceal the nature of the funds.

■ By the terms of the statute, the Government must prove that Wynn knew Edmond and Lewis derived their money from some form of illegal activity, but it need not prove that Wynn knew the precise activity in which the two were engaged. 18 U.S.C. § 1956(a)(1)(B)(i). Such evidence, however, cannot alone sustain a conviction because section 1956 prohibits the *laundering* of money, not merely the *spending* of money obtained illegally. *See United States v. Sanders,* 929 F.2d 1466, 1472–73 (10th Cir. 1991) (finding purchasers of car did not violate § 1956 by using drug trafficking proceeds when there was no effort to conceal). Thus, the Government must prove that Edmond and Lewis were motivated by a desire to conceal or disguise the source or the ownership of the money they spent at Linea Pitti and that Wynn knew of this design. As other circuits have observed, the language of the statute requires only that Edmond and Lewis—not Wynn—be motivated by a desire to conceal. *United States v. Campbell,* 977 F.2d 854, 857–58 (4th Cir.1992) (upholding § 1956 conviction of real estate agent who sold a house to a drug dealer despite the fact that she was motivated only by the desire to earn a commission); *accord United States v. Carr,* 25 F.3d 1194, 1206 (3d Cir.1994); *United States v. Awan,* 966 F.2d 1415, 1424–25 (11th Cir.1992).

■ The concealment of illegal proceeds, however, need have been only one of Edmond's and Lewis's purposes in purchasing the clothing; it need not have been their sole purpose. *Campbell,* 977 F.2d at 859; *Sanders,* 929 F.2d at 1472. "The conversion of cash into goods and services as a way of concealing or disguising the wellspring of the cash is a central concern of the money laundering statute." *United States v. Jackson,* 935 F.2d 832, 841 (7th Cir.1991). A requirement that concealment be the sole motivating factor of a transaction would make the enforcement of the statute to punish those who convert dirty money into goods and services nearly impossible as the owner of the illegal proceeds could always legitimately claim to be motivated in part by a desire to obtain the items purchased.

■ At Wynn's trial, Linea Pitti employees testified that they and their fellow employees assumed from Edmond's and Lewis's behavior and appearance that the two were drug dealers, that the two wore beepers which often went off in the store, and that they paid for merchandise with small bills. The store's bookkeeper testified that Wynn often failed to record Lewis's or Edmond's name on sales receipts after making a sale to them, contrary to the store's customary business practice. Read in the light most favorable to the Government, the evidence suggests that Wynn also told employees who waited on Edmond and Lewis in Wynn's absence not to record their names on sales receipts. The Government also presented evidence that Lewis loaned Linea Pitti $20,-000 and that Wynn subsequently put Lewis on the store's payroll. Lewis was paid $9,200 by Linea Pitti in 1988, although store

employees testified that they never saw him perform any work.

Events that occurred during the grand jury's investigation also suggest guilty knowledge on Wynn's part. In 1989, the grand jury issued a subpoena for Linea Pitti's business records, including daily sales reports maintained by the store's bookkeeper. One copy of these documents was maintained and submitted to the grand jury by Linea Pitti's accountant. In this copy, the daily sales reports were written in the handwriting of Linea Pitti's bookkeeper; and sales made to Edmond and Lewis were attributed to "Tony Lewis" and to "Ray Ford," the name by which Linea Pitti's bookkeeper knew Edmond. Linea Pitti also responded to the subpoena by submitting photocopies of its "original" business records. In this set of records, sales actually made to Edmond or Lewis were attributed to "John Brown" or "Reco Smith," and these obviously false entries were made in Wynn's handwriting.

The body of evidence, when considered as a whole, provided the jury with ample basis for convicting Wynn. The jury reasonably could have concluded that Wynn had attempted to hide the fact that Edmond and Lewis had spent hundreds of thousands of dollars in small bills at Linea Pitti. From this and the evidence that Edmond and Lewis were notorious drug dealers, the jury reasonably could have inferred that Wynn knew that their money was dirty and that he knew that the two were anxious to disguise their identity as the purchasers of the merchandise and the source of the cash used to pay for it.

In light of the abundant relevant trial testimony, Wynn's claim that there was "no evidence" of his knowledge is clearly misplaced. His true objection seems to be to the circumstantial nature of the Government's *scienter* evidence. This objection, however, goes to the weight of the evidence, not its sufficiency, and is more properly addressed to a jury than to us. There is, of course, no legal requirement that the Government present direct rather than circumstantial evidence of a defendant's guilt. *Poston,* 902 F.2d at 94 n. 4.

The cases on which Wynn relies for his insufficiency of the evidence claim are clearly distinguishable. In *United States v. McDougald,* 990 F.2d 259 (6th Cir.1993), the defendant was asked by a friend to take $10,000 in cash and use it to purchase a car for a third person whom the defendant had met only once and who turned out to be a drug dealer. *Id.* at 260. In reversing McDougald's money laundering conviction, the Sixth Circuit held that, not only was there insufficient evidence that the $10,000 constituted drug proceeds, there was insufficient evidence that McDougald knew its source. *Id.* at 261–62. In *Sanders,* the Tenth Circuit reversed the money laundering convictions of a drug distributor who used her illegal proceeds to purchase two cars, finding that the undisguised purchase, registration, and use of the vehicles by her and members of her family were inconsistent with a motivation to conceal the source or ownership of the illegal proceeds. 929 F.2d at 1472–73. In contrast to the facts of those cases, Wynn's ongoing relationship with Edmond and Lewis and his efforts to disguise their identity as customers suggests knowledge both of illegal activities and of a design to conceal.

### 2. The automobile purchases

On December 21, 1987, Lewis and Edmond visited a Northern Virginia automobile dealer where Lewis introduced himself as "Tony Wynn," said that his uncle, Charles Wynn, was going to buy him a Range Rover, and provided a cash downpayment of $500. The following day, Wynn used cash to purchase two cashier's checks made out to the dealership, one in the amount of $4,000, the other $8,000. On the same day, a Linea Pitti employee used cash to purchase a third cashier's check, made out to the dealership for $8,000, in the name of Charles Wynn. The three checks were secured from different financial institutions. The auto dealership's records indicate that it received the three cashier's checks on the same day and that they were to be applied toward the purchase of the Range Rover. Two days later, Wynn brought a fourth cashier's check to the dealership, this one for $8,500, along with a little over $1,000 in cash, to pay the balance of the

purchase price. He had the vehicle titled in his name. Lewis then returned to the dealership and took possession of the car.

When the Range Rover was at the dealership for repairs the following month, Lewis informed the dealer that he wanted to trade it in for a new 1988–model Range Rover. Wynn then returned to the dealership to pay the difference between the trade-in value of the one-month-old Range Rover and the price of the new one, confirming that the new vehicle was also for his "nephew," "Tony Wynn." Wynn paid the amount due with two cashier's checks, each for $5,000, plus nearly $4,000 in cash. Again, the car was titled in his name, but Lewis drove it off the dealer's lot. The jury convicted Wynn of six violations of 18 U.S.C. § 1956(a)(1)(B)(i)—one violation for each of the six cashier's checks involved in the purchases of the two vehicles.

Wynn's challenge to these six convictions focuses on the second element of proof required for a section 1956(a)(1)(B)(i) violation. Specifically, he argues that there was insufficient evidence that the cash used to purchase the six cashier's checks constituted the proceeds of a "specified unlawful activity"—in this case, the distribution of controlled substances. 18 U.S.C. § 1956(a)(1). Wynn contends that there is no evidence that Lewis was the source of the cash used to purchase the cashier's checks. Again, the evidence against Wynn on these charges is entirely circumstantial; but reasonable jurors could conclude from the testimony that Lewis funded the Range Rover purchases. Although the jury was free to believe that the vehicles were gifts from Wynn to Lewis, the method of payment and the clear attempt to disguise Lewis's identity strongly suggest that Lewis used Wynn as a middleman for precisely the activity that section 1956 seeks to prevent: injecting illegal proceeds into the stream of commerce while obfuscating their source.

Wynn also argues that even if the funds used to purchase the cashier's checks were provided by Lewis, the Government presented no evidence that they were the proceeds of illegal activities. He points to evidence elicited at trial establishing that Lewis won at least $150,000 in the Maryland lottery during 1986, implying that the vehicles might have been purchased with legally obtained funds. Although Wynn frames this argument as a question of fact, he bases it on an uncertain legal proposition: that if Lewis's legitimately derived income exceeds the amount at issue in a money laundering charge, the Government must trace the funds involved in the financial transaction to Lewis's illegal activities in order to convict Wynn under section 1956.

We need not resolve this issue here, however, because the Government presented sufficient evidence for the jury to conclude that the money used to purchase the six cashier's checks did flow directly from Lewis's narcotics trafficking activities. Wynn purchased the cashier's checks with cash. For each of the Range Rover transactions, he purchased two or more cashier's checks from different banks, clearly suggesting an intent to disguise the amount of cash from the banks, which are required to report cash transactions of $10,000 or more. These circumstances certainly support an inference that the cash had an illegal source.

## C. Transacting in Criminally Derived Property

The Government charged Wynn with three counts of transacting in criminally derived property, in violation of 18 U.S.C. § 1957(a) (1988), the sister provision of 18 U.S.C. § 1956. Section 1957(a) provides, in relevant part, that

> Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished....

18 U.S.C. § 1957(a). Like section 1956, this provision requires the Government to prove that the property involved in the transaction was derived from a "specified unlawful activity," while the defendant need know only that the property was acquired illegally. It differs from section 1956 in two critical respects: It requires that the property have a value greater than $10,000, but it does not require that the defendant know of a design to conceal aspects of the transaction or that

anyone have such a design. Due to the omission of a "design to conceal" element, section 1957 prohibits a wider range of activity than money "laundering," as traditionally understood. *See* Emily J. Lawrence, Note, *Let the Seller Beware: Money Laundering, Merchants and 18 U.S.C. §§ 1956, 1957,* 33 B.C.L.Rev. 841, 865–66 (1992). Thus, a section 1957 violation is easier to prove, in this respect, than a section 1956 violation.

The Government presented undisputed evidence that on December 11, 1987, Edmond made a payment of $15,166.50 to Linea Pitti and that the same amount was deposited, in cash, in the store's bank account on the same day. Wynn does not contend that the money involved was "derived" from his lawful sale of merchandise as opposed to from Edmond's illegal activities. Nor does he argue that a bank deposit fails to constitute a "monetary transaction in criminally derived property" prohibited by the statute. He questions only the sufficiency of the evidence establishing that he knew the money was "criminally derived." We believe that Wynn's course of dealings with Edmond and Lewis dating back to March 1987—in which they made cash purchases of nearly a half-million dollars worth of merchandise and he attempted to disguise the source of that cash—supports the jury's inference that Wynn knew or was willfully blind to the fact that the cash involved in this particular transaction was criminally derived.

### D. Illegal Structuring

■ Federal law requires financial institutions to file Currency Transaction Reports with the Secretary of the Treasury for cash transactions in excess of $10,000. 31 U.S.C. § 5313 (1988); 31 C.F.R. § 103.22(a) (1994). A related provision, under which Wynn was convicted on two counts, forbids structuring a transaction to evade this requirement. It provides that

[n]o person shall for the purpose of evading the reporting requirements of section 5313(a) . . .

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a)(3) (Supp. IV 1992). A third related provision establishes that "criminal penalties" are available for persons who "willfully" violate this statutory scheme. 31 U.S.C. § 5322(a) (Supp. IV 1992).

Last year, in *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the Supreme Court interpreted the term "willfully" to require the Government to prove that a "defendant acted with knowledge that his conduct was unlawful" in order to secure a conviction under section 5324. *Id.* at ——, 114 S.Ct. at 657. Like Wynn, Ratzlaf purchased a series of cashier's checks from different banks, which he used to pay off a single debt of more than $10,000. *Id.* On appeal of his conviction, Ratzlaf maintained, and the Supreme Court agreed, that he could not be convicted "solely on the basis of his knowledge that a financial institution must report currency transactions in excess of $10,000 and his intention to avoid such reporting." *Id.* at —— – ——, 114 S.Ct. at 657–58. Because *Ratzlaf* was issued while Wynn's convictions were pending appeal, it is controlling. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (new judicial rulings for criminal prosecutions apply retroactively to all cases not yet final). Wynn contends that the evidence against him is insufficient to support his convictions because it does not establish that he knew structuring was unlawful. We agree; consequently, we reverse his two section 5324 convictions.

To be sure, there was abundant evidence that Wynn was aware that financial institutions are required to report large cash deposits. Wynn's purchase of four separate cashier's checks to purchase the Range Rover in 1987 and three separate checks to pay off the bank loan in 1988, each for less than $10,000, created an inference that he was motivated to avoid the reporting requirement. The Government maintains that these inferences, coupled with Wynn's knowledge that he was laundering money when making the Range Rover purchase, permitted the jury to infer a willful violation of section 5324. It relies heavily on a footnote in *Ratzlaf* that states, unremarkably, that the requisite knowledge

may be inferred from conduct. —— U.S. at —— n. 19, 114 S.Ct. at 663 n. 19.

We recognize that, since the issuance of *Ratzlaf,* the Government's position has found support in decisions by the First Circuit, which recently held on similar facts that the purchase of money orders at three separate banks "tends to prove knowledge of illegality," *United States v. Marder,* 48 F.3d 564, 574 (1st Cir.1995), and the Seventh Circuit, which found that a defendant's scheme to enlist family members to purchase numerous money orders and cashier's checks in small denominations provided sufficient evidence of knowledge of illegality. *United States v. Walker,* 25 F.3d 540, 543, 548 n. 8 (7th Cir. 1994). Given the Supreme Court's discussion in *Ratzlaf,* however, we must disagree.

As the *Ratzlaf* Court pointed out, structuring financial transactions is not an "inevitably nefarious" activity: Every day, law abiding citizens structure transactions to avoid the impact of a regulation or a tax without running afoul of the law. —— U.S. at ——, 114 S.Ct. at 661. For evidence that such activities are quite often legal, we need look no further than the antistructuring law Wynn was convicted of violating. In 1970, Congress imposed reporting requirements on financial institutions and made their failure to report certain cash transactions a crime. It was not until 1987, however, that Congress made it a crime to structure transactions so as to avoid the triggering of these requirements. *See* Sarah N. Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring Transactions,* 41 Fla.L.Rev. 287, 288 (1989). That the structuring activity undertaken by Wynn was completely legal prior to 1987 suggests that the fact that he violated the antistructuring law cannot, without more, logically constitute proof that he had knowledge of the law. If anything, evidence that a person performed an act that is not "inevitably nefarious" would seem to suggest the opposite conclusion: that he was unaware the action was illegal.

The Supreme Court explicitly based *Ratzlaf* on the proposition that, while ignorance of the law generally is no excuse, Congress may decree otherwise and has done so by requiring proof of "willfulness" before the imposition of criminal penalties for structuring activity. —— U.S. at ——, 114 S.Ct. at 663. Permitting a violation of the law—*i.e.,* structuring—alone to serve as sufficient evidence of knowledge of the law would effectively merge the two elements and deprive Congress of this privilege. The jury, of course, may infer knowledge of the law from circumstantial evidence, but for the willfulness requirement to be more than "essentially ... surplusage," *id.* at ——, 114 S.Ct. at 659, that evidence must suggest knowledge of the antistructuring law as distinct from knowledge of financial institutions' reporting requirements. *See, e.g., United States v. Retos,* 25 F.3d 1220, 1231 (3d Cir.1994) (reversing structuring conviction due to improper jury instruction but finding that, as defendant was an attorney, the jury could conclude he knew his structuring actions were unlawful); *United States v. Dichne,* 612 F.2d 632, 636–37 (2d Cir.1979) (upholding conviction for willfully violating a currency reporting statute where the Government posted notices in airport departure area that the law required travelers to report the transport of $5000 or more out of the country). We can find nothing in the record that suggests that Wynn knew that his structuring activity was criminal.

We recognize, as did the *Ratzlaf* dissent, that the Court's statutory interpretation could render prosecutions under section 5324, as it was then written, more difficult. *Ratzlaf,* —— U.S. at —— – ——, 114 S.Ct. at 669–70 (Blackmun, J., dissenting). It would appear that this observation was not lost on Capitol Hill. Following *Ratzlaf,* Congress passed the Riegle Community Development and Regulatory Improvement Act, which added a criminal penalty provision to section 5324 that avoids any reference to "willfulness." Pub.L. No. 103–325, § 411, 108 Stat. 2160, 2253 (1994). Nonetheless, we are required to apply to Wynn the law in force at the time he purchased the cashier's checks.

### E. Conspiracy

■ Finally, the jury convicted Wynn on one count of conspiracy, in violation of 18

U.S.C. § 371 (1988), in connection with the 66 money laundering, structuring, and obstruction of justice counts for which he was indicted. To establish a conspiracy, the Government must prove: (1) an agreement between two or more persons to commit an offense, (2) knowing participation in the conspiracy by the defendant with the intent to commit at least one of the substantive offenses charged, and (3) the commission of at least one overt act in furtherance of the conspiracy. *United States v. Treadwell,* 760 F.2d 327, 333 (D.C.Cir.1985).

█ In addition to renewing his arguments that he had no knowledge of either the illegal provenance of Edmond's and Lewis's huge quantities of cash or any intent to conceal their source, which we have rejected, Wynn contends that the Government presented insufficient evidence of the requisite agreement. The Government's strongest proof of an agreement between Wynn and either Edmond or Lewis concerns the two Range Rover purchases. Wynn paid for vehicles Lewis initially selected and later took possession of at the dealership. Moreover, Lewis and Wynn each told the dealership the same lie: that Lewis was Charles Wynn's nephew, Tony Wynn. This is certainly sufficient evidence for a jury to conclude that Wynn entered into an agreement with Lewis to help him launder money. In fact, it would be difficult to reach a contrary conclusion.

This evidence of an agreement is sufficient to support the one count conspiracy conviction. *See Griffin v. United States,* 502 U.S. 46, 55–58, 112 S.Ct. 466, 472–73, 116 L.Ed.2d 371 (1991) (conviction on a multiple-object conspiracy charge is proper when evidence supports conviction as to one object but is insufficient to support conviction as to other objects). Consequently, we need not determine whether there was sufficient evidence to find that Wynn otherwise conspired with Edmond and/or Lewis to violate the law.

### III. CONCLUSION

We affirm Wynn's 32 convictions for money laundering, transacting in criminally de-

rived property, and conspiracy. We reverse his two structuring convictions for insufficient evidence of "willfullness" as defined in *Ratzlaf.* The case is remanded to the district court for resentencing consistent with this opinion.

*So ordered.*