# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Submitted December 3, 2010          Decided March 4, 2011

No. 09-3121

UNITED STATES OF AMERICA,
APPELLEE

v.

COURTNEY A. STADD,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00065)

---

*Dorrance D. Dickens* was on brief for the appellant.

*Ronald C. Machen*, *Jr.*, United States Attorney, and *Roy W. McLeese III*, *John P. Mannarino*, *David S. Johnson* and *Matthew C. Solomon*, Assistant United States Attorneys, were on brief for the appellee.

Before: GINSBURG, HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Courtney Stadd (Stadd) appeals from his conviction on one count of committing an act affecting a personal financial interest in violation of 18 U.S.C. §§ 208(a) and 216(a)(2) and two counts

of making false statements in violation of 18 U.S.C. § 1001(a)(2). The convictions arose from his involvement in the allocation of a $15 million congressional earmark while serving as the interim Associate Administrator of the National Aeronautics and Space Administration (NASA). Stadd challenges the sufficiency of the evidence to support his convictions and the jury instructions regarding the section 208(a) violation. We affirm his conviction on all three counts.

I.

In April 2005, incoming NASA Administrator Michael Griffin (Griffin) asked Stadd to serve as NASA's Deputy Administrator, the agency's second highest position. Griffin sought Stadd for the position because Stadd had served as NASA's chief of staff during President George W. Bush's first term and thus was familiar with many NASA employees and knew how the agency worked. Stadd declined the deputy administrator position, citing impending personal expenses and stating he felt he needed to leave government and return to the private sector. He agreed, however, to serve on an interim basis as associate administrator to help Griffin transition into his new role as Administrator. Griffin described the associate administrator position as equivalent to a chief operating officer.

Stadd initially filled the associate administrator slot as a government contractor but on April 28, 2005[1] he was converted to a special government employee (SGE) and, as such, became subject to the ethics laws governing federal officials/employees. He received an ethics briefing from NASA's general counsel's office, that included the following statement about 18 U.S.C. § 208(a):

> Basic Rule: Employees must not act officially on matters which may affect their personal interests. . . .

---

[1] All events occurred in 2005 unless otherwise noted.

An employee is disqualified . . . from participating personally and substantially . . . in any particular matter . . . in which the employee, or anyone whose interests are imputed to the employee, . . . has a financial interest, if the particular matter will have a *direct and predictable effect on that interest*. In other words, an employee may not work on a particular matter in which the employee's outside employer has an interest.

Exs. App. 139-41, *United States v. Stadd*, No. 09-3121 (D.C. Cir. Apr. 29, 2010) (Exs. App.) (Senior New Entrant Ethics Briefing PowerPoint) (emphasis added).

At the time, Stadd was sole proprietor of Capitol Solutions, a consulting firm whose clients included the GeoResources Research Institute (GRI) at Mississippi State University (MSU), among others. He disclosed to NASA a list of his clients, including GRI, and explained that GRI had held contracts with NASA's Earth Sciences office in the past but stated that during his time acting as NASA's interim associate administrator he intended to focus on non-NASA matters for GRI. Through periodic e-mails, Stadd kept Adam Greenstone (Greenstone), his ethics advisor in NASA's general counsel's office, informed of his efforts to comply with the ethics laws. For instance, in an e-mail dated May 1, Stadd wrote, "I am strictly confining my role to that of an advisor and facilitator vis-à-vis organizational transition issues . . . and whenever possible avoiding meetings or any situations that indirectly or directly affect my outside business activities." Gov't App. Tab 8, *United States v. Stadd*, No. 09-3121 (D.C. Cir. July 19, 2010) (Gov't App.). In the same e-mail, he reported that he had absented himself from a NASA staff meeting when the discussion turned to a pending meeting between one of his clients and the Administrator and that he had requested to be excluded from any meetings regarding a matter in which one of his clients had a "secondary

4

interest." *Id.* In a May 11 e-mail, Stadd reported he had met with two of his clients and informed them he was recused "from any and all NASA meetings or activities indirectly or directly related" to them. *Id.* Tab 9.

On June 13, Stadd signed an ethics agreement "regarding [his] federal service commencing April 28, 2005." Gov't App. Tab 11 at 1. In the agreement, he disclosed his financial interests, including his consulting services provided to GRI at MSU, and pledged he would "not participate in any matters involving any of these entities in the course of [his] NASA official duties." *Id.* at 2. He acknowledged that he "[would] still be considered to have a financial interest in [the disclosed] entities, and [would] therefore recuse [himself] from actions involving them." *Id.* He further pledged that during his tenure with NASA, he would "not engage in any activities in which [he] represent[ed] another person or organization, or [his] own private interests, or may appear to be doing these things to NASA." *Id.* More generally, the ethics agreement provided that Stadd was to "provide advice, guidance and recommendations to senior NASA management on a range of issues related to organizational transition, and [sic] well as on various transition activities involving the strategic direction of NASA programs and activities" but "not [to] perform any management or supervisory work, make final decisions on substantive policies, or otherwise function in the agency chain of command." *Id.* at 1.

A. The $15 Million Earmark

Before his confirmation as NASA Administrator, Griffin met with members of the Congress, many of whom were angry about the previous NASA Administrator's policy of failing to honor congressional earmarks. They let Griffin "know in no uncertain terms that [he] would be expected to take care of [honoring earmarks] on [his] first day." Trial Tr. 136, *United States v. Stadd*, No. 09-3121 (D.D.C. Aug. 4, 2009) (Trial Tr.).

Griffin testified that, in his four years as Administrator, he remembered only two earmarks specifically—one of them the earmark involved in this case. He remembered it "because it was . . . with Senator Thad Cochran," who was a senator from Mississippi and "the head of [S]enate appropriations," making him, from Griffin's perspective, "the most powerful senator in the Congress." *Id.* at 139. Cochran's staff informed Griffin "that the senator was unhappy that his earmark for Mississippi had not been honored." *Id.* Griffin testified that he "made a point in [his] first management meeting . . . that [NASA] would take care of earmarks immediately" and that he "absolutely recall[ed] giving that direction to the acting head of legislative affairs." *Id.* at 137. A NASA employee testified that Stadd was present at that meeting and that, as the meeting attendees were leaving, the employee heard Griffin indicate to "his [senior] staff around him which was [Stadd] and the others we need to follow up on [the earmark issue] and make sure these guys are following through." Trial Tr. 146 (Aug. 5, 2009).

On May 11, Stadd met David Shaw (Shaw), the director of GRI at MSU, for dinner. The two met in the lobby of NASA headquarters before walking to a nearby restaurant. The next day, May 12, Stadd notified Greenstone via e-mail of his dinner with Shaw. The e-mail read, in part:

> The conversation involved no reference whatsoever to NASA. I explained upfront that I am completely recused from any discussions or actions that might in any way impinge on MSU. I stressed that I am barred from any representational work vis-a-vis NASA on behalf of MSU. Dr. Shaw said that he understood the rules of engagement.

> I also indicated that I would be sending him a summary of the ethics agreement that is currently being drafted by NASA ethics attorneys.

Trial Tr. 7 (Aug. 4, 2009). At trial, Shaw testified the "[p]rimary focus" of their dinner discussion was MSU's "efforts with [the National Oceanic and Atmospheric Administration]," an issue on which Stadd was advising MSU. Trial Tr. 18-19 (Aug. 5, 2009). He testified they discussed NASA but only "in very general terms," including the transition to a new administrator and administrative team. *Id.* at 19. Shaw testified that Stadd did not explain that he (Stadd) was completely recused from any discussions or actions that might in any way impinge on MSU, did not stress that he was barred from any representational work vis-à-vis NASA on behalf of MSU and did not indicate that he would send Shaw a summary of his ethics agreement. Further, Shaw testified he (Shaw) did not remember saying he understood the rules of engagement and never received a copy or summary of Stadd's ethics agreement. *Id.* at 20-21.

About one week after their dinner, on May 17, Shaw e-mailed Stadd regarding a $15 million earmark directed to NASA's earth science application program. In the e-mail, Shaw mentioned he had heard that Mary Cleave (Cleave)—who was then the acting director of NASA's sun earth systems division, which division oversaw the earth science program—intended to distribute the $15 million through a national competition rather than through the Mississippi Research Consortium (MRC), a consortium of four Mississippi research institutions; of the four, MSU had the largest earth science program. Shaw wrote that MSU would likely receive no more than a small portion of the funds if they were distributed through a national competition, a result he "assure[d]" Stadd would "not sit well with . . . Senator Cochran." Trial Tr. 190 (Aug. 4, 2009). Shaw concluded the e-mail by asking Stadd: "Have you been a part of any discussions on this, can you shed light or provide some prodding?" *Id.*

On May 26, Stadd copied Shaw on an e-mail in which Stadd said he was going to meet with Cleave on May 27 "re: the

Cochran funds." Gov't App. Tab 15; Trial Tr. 5-6 (Aug. 5, 2009). Stadd also claimed to "have [Administrator] Mike[ Griffin's] endorsement." Trial Tr. 6 (Aug. 5, 2009). Cleave testified that before the meeting she "thought it was probably about Mississippi money" "[b]ecause of this $15 million earmark language and the historical interest of the Mississippi [congressional] delegation in earth science applications in Mississippi." Trial Tr. 69 (Aug. 4, 2009). At the meeting, Stadd informed Cleave "that a deal had been cut between the previous [NASA] administrator . . . and the Mississippi [congressional] delegation and [the $15 million earmarked funds] needed to go to Mississippi." *Id.* at 72. Stadd did not expressly mention MSU, and Cleave did not know MSU was Stadd's client. Cleave "push[ed] back" against Stadd, explaining that she had planned to distribute the money through a national competition and that, because the earmark was not limited to Mississippi, "there would be a lot of push back from the scientific community" if the money went only to Mississippi. *Id.* at 73-74. In response, Stadd told Cleave to distribute $3 million of the $15 million through a national competition, with the other $12 million going to Mississippi. *Id.* at 74. Cleave testified that it was not unusual for her to be told how to allocate funds verbally rather than in writing. *Id.* at 74-75 ("I know that $15 million sounds like a lot of money, but when you're talking about a $5 billion budget, getting verbal direction on this amount of money is not unusual."). She also described the meeting as "uncomfortable." *Id.* at 76. After the meeting, Stadd e-mailed Shaw and told him "the meeting did not go well" and "Cleave still intended to put [the money] out for the national competition." Trial Tr. 9 (Aug. 5, 2009).

Despite Stadd's assessment of the meeting, NASA directed $12 million of the earmark to the MRC. MSU ultimately received approximately $9.6 million of the $12 million distributed by the MRC. When NASA first directed the funds to the MRC, however, Shaw "was very disappointed and very

upset" about the limits NASA placed on the MRC's distribution of the funds and conveyed his position to Stadd. Trial Tr. 12 (Aug. 5, 2009). On June 22, Stadd's penultimate day at NASA, he sent the following e-mail to Shaw:

> [O]verall I gathered [the NASA requirements were] framed in a way that constrains GRI from getting the bulk of the funds. If true, I am beyond pissed. I broke my fucking (excuse my language) pick to salvage the funds . . . . I steered Mary Cleave so that Ron had clear running room. And now am I to believe that the son of a bitch framed it so that MSU is screwed? . . . If true, David [Shaw], I do not know what to do. I am literally out of ideas. If I intervene anymore then all sorts of red flags will go up and I fear getting MSU and me in trouble. . . .
>
> . . . Unless you e-mail me back with a different interpretation of [NASA's requirements] and [their] impact on MSU I will have to report back to [Griffin] that the effort to address Cochran's concerns has been a complete failure.

Gov't App. Tab 16. The following day, Stadd's last at NASA, he told Griffin's chief of staff "that Senator Cochran's office was unhappy with the way that the science mission director was implementing one of his earmarks." Trial Tr. 63 (Aug. 5, 2009). The chief of staff told Stadd later that he disapproved of Stadd "trying to get this earmark directed to Mississippi State" because it created an "appearance of inappropriate behavior." *Id.* at 69; *see id.* at 67-70, 76.

### B. MSU's Payments to Stadd

By invoice dated June 1, Stadd charged MSU $27,450, primarily for assisting his client, GRI, with the National Oceanic and Atmospheric Administration. Gov't App. Tab 17. The invoice also stated that Stadd had "assisted GRI in

understanding personnel and policy changes at NASA HQ, including efforts (January – April 15, 2005) to ensure that the appropriate earth science research programs were appropriately refocused in areas of potential benefit to MSU/GRI."[2] *Id.* Shaw testified that he believed the work described in the June 1 invoice included Stadd's actions involving the $15 million earmark while he was a SGE at NASA. Trial Tr. 26 (Aug. 5, 2009). Shaw testified there was nothing else Stadd could have done pursuant to his consulting agreement with MSU that fit the description given in the invoice, notwithstanding the purported ending date of April 15, 2005 Stadd had specified in the invoice. *Id.* Further, Shaw testified he did not seek Stadd's assistance with the earmark before May 2005, at which point Stadd was serving as a SGE.[3] *Id.* at 26-27. In an e-mail dated October 31—about four months after Stadd had left NASA—Stadd tried to increase his compensation from MSU. Gov't App. Tab 18. To justify the raise, he listed work performed for MSU, including "the recovery of the earmarked NASA procurement."[4] *Id.* Shaw testified that he believed Stadd was referring to the $15 million earmark because Stadd had not worked on any other NASA earmark for MSU during that time. Trial Tr. 33-34 (Aug. 5, 2009).

By indictment filed March 6, 2009, Stadd was charged with one count of committing an act affecting a personal financial interest in violation of 18 U.S.C. §§ 208(a) and 216(a)(2) for his

---

[2] April 15, 2005 is the day Stadd began to serve as interim associate administrator.

[3] Stadd contends he had a pre-existing contract with MSU, under which he was scheduled to receive payments of $27,496 on specific dates, including June 1.

[4] MSU increased Stadd's monthly compensation but offered him only a six-month contract.

actions regarding the $15 million earmark and two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2): one count based on his May 12, 2005 e-mail to Greenstone regarding his dinner with Shaw and the second count based on the statements contained in the ethics agreement he executed *nunc pro tunc* on June 13. Following a three-day trial, the jury convicted Stadd on all three counts on August 6, 2009. The district court sentenced Stadd to thirty-six months' probation on each count, to be served concurrently, a $2500 fine, a $300 special assessment and 100 hours of community service during the first twelve months of probation.[5]

## II.

We address, first, Stadd's challenge to the sufficiency of the evidence and, second, his challenge to the jury instructions.

### A. Sufficiency of the Evidence

Stadd challenges the sufficiency of the evidence supporting the three counts of conviction. "When reviewing a guilty verdict for sufficiency of the evidence, we view the evidence in the light most favorable to the Government and must affirm the verdict if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Wynn*, 61 F.3d 921, 923 (D.C. Cir. 1995)

---

[5] In August 2010, Stadd pleaded guilty to one count of conspiracy to defraud the government in violation of 18 U.S.C. § 371. Plea Agreement, *United States v. Stadd*, No. 1:09cr108HSO-RHW (S.D. Miss. Aug. 4, 2010). The allegations in that case also relate to obtaining funds from NASA for MSU's use. The court sentenced Stadd to forty-one months' imprisonment followed by three years of supervised release and imposed a $100 assessment, a $7500 fine and $287,000 in restitution. Judgment, *United States v. Stadd*, No. 1:09cr108HSO-RHW (S.D. Miss. Nov. 24, 2010).

(emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), *cert. denied*, 516 U.S. 1015 (1995).

### 1. 18 U.S.C. § 208(a) Count

There are four elements of the crime set out in 18 U.S.C. § 208(a): (1) "an officer or employee of the executive branch of the United States Government" (2) "participates personally and substantially as a Government officer or employee" (3) "in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter" (4) in which he knows he has a financial interest.[6]   Stadd maintains the Government failed to prove the final three elements.

---

[6] The statute provides, in relevant part:

> [W]hoever, being an officer or employee of the executive branch of the United States Government, . . . including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—Shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 208(a). Section 216 of Title 18 sets forth the penalties for a violation of section 208, including imprisonment and/or a fine. 18 U.S.C. § 216.

12

Taking the third element first, we conclude that there was ample evidence from which the jury could conclude the allocation of the earmarked funds was indeed a "particular matter" within the meaning of the statute. Stadd relies upon the definition of "particular matter" contained in 5 C.F.R. § 2635.402(b)(3) as "encompass[ing] only matters that involve deliberation, decision, or action that is focused upon the interests of specific persons, or a discrete and identifiable class of persons." Accordingly, "particular matter" does not include "the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons." *Id.* Stadd claims he did not participate in a "particular matter" because his actions focused on the State of Mississippi, which consists of "a large and diverse group of persons," and not upon the interests of "specific persons, or a discrete and identifiable class of persons." The flaw in his argument is that the $15 million earmark did *not* go to the State of Mississippi; it went instead to the MRC, to be divided among its four member institutions, with the lion's share—$9.6 million of $12 million—going to MSU's GRI, Stadd's client. Stadd intended that the funds go to the MRC and they did so.[7] Moreover, Stadd's June 22 e-mail plainly manifested his frustration that MSU might get "screwed" out of the funds. Gov't App. Tab 16. A reasonable jury could conclude from the evidence that Stadd was focused, at most, on the interests of the four research institutions comprising the MRC and, in particular, on MSU's interests. The four member institutions of the MRC are sufficiently discrete and identifiable that Stadd participated in a "particular matter" under the statute.

---

[7] Shaw's May 17 e-mail to Stadd that prompted Stadd to meet with Cleave did not complain that the earmarked funds were not going to Mississippi but that they were not going "through the MRC." Trial Tr. 188-89 (Aug. 4, 2009).

Having determined that ample evidence supported the third element of a section 208(a) violation, we next conclude that, again, ample evidence supported the second element. Stadd participated both "personally and substantially" in the distribution of the earmarked funds. Cleave planned to distribute the funds through a national competition. Stadd persuaded Cleave, however, to allocate $12 million of the $15 million earmark to the MRC. Of that $12 million, MSU received nearly $10 million.[8]

Finally, we conclude that sufficient evidence supports the fourth element—that Stadd knew he had a financial interest in the "particular matter." In addition to a consultant's obvious financial interest in an award of millions of dollars to one of his

---

[8] We reject Stadd's argument that he simply effectuated the intent of the Congress that the earmarked funds go to Mississippi. The legislation directed that the funds "be used to support competitively-selected applications projects." H.R. Rep. No. 108-792, at 1602 (2004) (Conf. Rep.); *see* Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3333-35 (2004). Even if there were a congressional understanding that the funds be directed to Mississippi, Stadd's actions nonetheless violated section 208(a). As the Seventh Circuit has explained, the Congress intended section 208(a) "to proscribe rather broadly employee participation in business transactions involving conflicts of interest and to reach activities at various stages of these transactions." *United States v. Irons*, 640 F.2d 872, 876 (7th Cir. 1981). For that reason, section 208(a) reaches "acts which execute or carry to completion a contract or matter as to which the acts of rendering advice or making recommendations are specifically proscribed." *Id.* at 878; *accord United States v. Selby*, 557 F.3d 968, 971 (9th Cir. 2009) (per curiam) (affirming conviction under section 208 where employee had not participated in initial contract between her employer and her husband's employer but used her position to "promote[] extensive additional use of [her husband's employer's] software and participated in the decision-making process to implement further use of [her husband's employer's] products").

clients, Stadd submitted an invoice to MSU on June 1—while he was still working at NASA—in which Stadd sought compensation for his involvement in the award process. Moreoever, after he left NASA, Stadd sought a raise from MSU and listed "the recovery of the earmarked NASA procurement" as a service he had performed for MSU. Finally, Stadd disclosed in the ethics agreement that his financial interests included his consulting services to MSU and acknowledged "that because [he] may resume [his] business relationships [with his clients] following [his] departure from NASA, [he would] still be considered to have a financial interest in [those] entities, and [would] therefore recuse [himself] from actions involving them." Gov't App. Tab 11 at 2. In sum, we conclude there was sufficient evidence to support Stadd's conviction on the section 208(a) count.

### 2. 18 U.S.C. § 1001 Counts

Section 1001 of Title 18 of the U.S. Code provides, in relevant part:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title[ or] imprisoned not more than 5 years . . . .

18 U.S.C. § 1001(a). Stadd claims that the statements the government prosecuted him for making were not "materially" false. He relies upon the Fifth Circuit's decision in *United States v. Baker*, 626 F.2d 512 (5th Cir. 1980), which held that a statement is "materially" false under section 1001 only if it has "the capacity to influence a determination required to be made." *Id.* at 514 (quotation marks and citation omitted). Stadd argues neither of his statements influenced a determination *required* to

15

be made by NASA and neither was, therefore, "materially" false. Stadd's reliance on *Baker* is misplaced. The United States Supreme Court has adopted a different definition of materiality under section 1001: "In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (brackets in original) (quotation marks and citation omitted). *Neder*'s definition is of course the accepted definition of materiality. *See United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010) ("We now join the other circuits in holding a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed."); *United States ex rel. Longhi v. United States*, 575 F.3d 458, 468 (5th Cir. 2009) (using *Neder* definition of materiality); *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010) (same); *United States v. Jackson*, 546 F.3d 801, 815 (7th Cir. 2008) (same); *United States v. Heppner*, 519 F.3d 744, 749 (8th Cir. 2008) (same); *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008) (same); *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (same); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (same); *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) (same); *United States v. Fallon*, 470 F.3d 542, 546 (3d Cir. 2006) (same); *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003) (same). The jury charge correctly used this definition of materiality.[9]

---

[9] The jury instruction read: "A statement is 'material' if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed. Proof of actual reliance on the statement is not required. The Government need only make a reasonable showing of its potential effects." App. 118, *United States v. Stadd*, No. 09-3121 (D.C. Cir. Apr. 29, 2010) (App.).

Stadd does not—and could not—argue that his statements in his May 12 e-mail to Greenstone—statements contradicted by Shaw's testimony—were not capable of influencing Greenstone's actions as a lawyer in NASA's general counsel's office. Stadd was a high-ranking—albeit interim—federal official who had a consultant business in the private sector. In anticipation of Stadd's potential conflicts of interests, NASA's general counsel's office "wanted to make sure that someone was assigned to pay attention to [Stadd], [and] to give . . . Stadd the level of help that he needed to ensure compliance [with the ethics laws]." Trial Tr. 53 (Aug. 3, 2009) (testimony of Greenstone). Given Stadd's high-level position and his ties to the private sector, a reasonable jury could conclude Greenstone would have paid special attention to Stadd. Greenstone's testimony plainly supported that conclusion. *See id.* at 66 (Greenstone's testimony that he spent more time working with Stadd during Stadd's tenure than with any of the "dozens" of other NASA employees he advised). A reasonable jury could further infer from the evidence that, if Stadd had accurately reported the substance of his dinner conversation with Shaw, it would have raised red flags that would have led Greenstone to inquire further. Because Stadd misrepresented his discussion with Shaw, however, Greenstone saw no need to take any further action to ensure Stadd's compliance with applicable ethics laws and accepted Stadd's assertions. *See* Trial Tr. 9 (Aug. 4, 2009) (Greenstone's testimony that he accepted Stadd's e-mail representations as true because he "had no reason to doubt [] Stadd's veracity" and because Stadd expressed his "intention of working with [the general counsel's office] to follow the law").

Similarly, Stadd's execution of the ethics agreement gave Greenstone a "high level of confidence" that Stadd understood, and pledged to comply with, the applicable ethics laws. *Id.* at 17-18. We reject Stadd's argument that his execution of the ethics agreement cannot be material because he did not do so

until after he met with Cleave. The ethics agreement covered the entire term of Stadd's service as a SGE, as evidenced by the agreement itself, which recited that it covered "[Stadd's] federal service *commencing April 28, 2005*." Gov't App. Tab 11 at 1 (emphasis added). Moreover, Stadd pledged in the agreement not to participate in matters involving his clients "in the course of [his] NASA official duties" or to represent another person or organization or his own private interests "[d]uring [his] tenure with NASA." *Id.* at 2. That Stadd signed the agreement after having violated its terms makes it, if anything, easier to conclude he "knowingly and willfully" made a "materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2).

### B. Jury Charge on 18 U.S.C. § 208(a) Count

Finally, Stadd challenges the district court's jury charge describing a violation of section 208.[10] We review jury instructions de novo. *Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 52 (D.C. Cir. 2006). Stadd contends the district court should have instructed the jury using the language

---

[10] The jury instruction recited three elements of a section 208(a) violation:

*One:*    Defendant Stadd was a special Government employee of NASA;

*Two:*    The defendant participated personally and substantially as a special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise in a matter in which he knew that he had a financial interest; and

*Three:*    The defendant acted willfully.

App. 117.

of 5 C.F.R. § 2640.103.[11] Stadd maintains that NASA's general counsel's office advised him, using the regulation as the controlling law. According to section 2640.103, a defendant violates section 208(a) only "if the particular matter [in which he participates] will have a direct and predictable effect on [his financial] interest." 5 C.F.R. § 2640.103(a). Accordingly, Stadd argues the district court omitted an essential element of the offense charged in count one. His argument fails.

Even if "direct and predictable effect" were an element of the offense on which the jury should have been instructed, its omission was, at most, harmless error.[12] *See Neder*, 527 U.S. at 15 ("[T]he omission of an element [from a jury instruction] is an error that is subject to harmless-error analysis . . . ."). "Where there has been an error in instructions, we have held such error to be harmless if the jury necessarily found facts that would have satisfied a proper instruction." *United States v. Johnson*, 216 F.3d 1162, 1166 (D.C. Cir. 2000). Stadd's counsel argued to the jury that Stadd did not "know" he had a financial interest within the meaning of section 208(a) because he "believed" his participation had to have a direct and predictable effect on his

---

[11] Section 2640.103 was promulgated under 18 U.S.C. § 208(d)(2), which authorizes the Office of Government Ethics, after consultation with the Attorney General, to "issue uniform regulations for the issuance of waivers and exemptions" from section 208(a) and to "provide guidance with respect to the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee."

[12] Because we conclude that any error regarding the court's failure to charge the jury that Stadd's participation must have had a "direct and predictable effect" was harmless, we need not decide whether a "guidance" issued under 18 U.S.C. § 208(d)(2)(B), at least to the extent it further defines "financial interest," must be considered an element of the offense and therefore be included in the jury charge.

financial interest for the rule to be trigered. Trial Tr. 40, 51, 59, 62 (Aug. 6, 2009). The jury nonetheless convicted Stadd of violating section 208(a) and specifically found that he had sufficient knowledge to act "willfully." We can thus conclude it necessarily found facts that would have supported a guilty verdict had the "direct and predictable effect" language been included. In addition, Stadd's e-mails to Greenstone belie his claim that he believed he was prohibited from participating in only those matters with a direct and predictable effect on his financial interest. In those e-mails, Stadd stated that he was avoiding matters that directly *or indirectly* affected his clients. Gov't App. Tabs 8, 9. Accordingly, even if the district court erred by not including the "direct and predictable effect" language in the jury charge, its error was harmless.

For the foregoing reasons, Stadd's conviction is affirmed.

*So ordered*.