**UNITED STATES of America,**
**Appellee,**

v.

**Denise BRAXTONBROWN-**
**SMITH, Appellant.**

**No. 00–3030.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 4, 2001.

Decided Feb. 12, 2002.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant. With her on the brief was A. J. Kramer, Federal Public Defender. Neil H. Jaffee, Assistant Federal Public Defender, entered an appearance.

David B. Goodhand, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, John R. Fish-

er, Roy W. McLeese III and Mark H. Dubester, Assistant U.S. Attorneys.

Before: SENTELLE and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Denise Braxtonbrown–Smith appeals her conviction and sentence on numerous fraud and money laundering charges. Her principal contention is that the government failed to prove, by tracing or otherwise, that any of the funds used in the alleged money laundering transactions represented the proceeds of unlawful activity. In turn, she contends, this failure to trace necessarily tainted other counts of the judgment of conviction. In addition to several claims of instructional error, she contends that the district court erred in calculating her offense level, in delegating authority over the terms of her restitution payments to the Probation Office, and in ordering her to pay past due income taxes. We affirm the judgment of conviction except we remand for correction of her sentence and clarification of the restitution order.

I.

Viewing the evidence, as we must, in the light most favorable to the government, see *United States v. Harrison*, 204 F.3d 236, 239 (D.C.Cir.2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), the evidence showed that Braxtonbrown–Smith used Medicaid reimbursements paid to her company, Psychological Development Associates ("PDA"), for personal purposes, did not pay taxes on that money, and attempted to obtain loans through the submission of false documents. In early 1994, PDA

began a day-treatment program for mentally retarded adults called Better Treatment Centers ("BTC") that enabled it to obtain a provider number for billing Medicaid for services provided to its Medicaid eligible clients. PDA began receiving its first clients in February 1994 for its day-treatment program, who were assigned to the centers by the Mental Retardation and Developmentally Disabled Administration ("MRDDA") of the D.C. Department of Human Services, at an approved rate of $175.44 per client, per day. Prior to this time, PDA had been in desperate financial shape, missing payrolls on occasion throughout 1994 and failing to pay its debts. Its financial condition changed by the end of 1994 by which time Medicaid had reimbursed PDA for over $400,000. The BTC program accounted for nearly all of the income that PDA was receiving and by 1995, Braxtonbrown–Smith and Kenneth A. Strachan, the PDA controller, were able to skim funds from PDA for personal purposes. For example, numerous checks were drawn on the PDA operating account at NationsBank, ranging from $6000 to $8000, for Braxtonbrown–Smith's personal benefit.

In May 1995, PDA obtained a second Medicaid provider number for services it was to provide through a "free-standing" mental health clinic. Braxtonbrown–Smith's efforts over the next two years to set up the clinic in accord with Medicaid rules for staffing never proved fruitful. Notwithstanding the fact that PDA had failed to set up and operate the clinic, Braxtonbrown–Smith, through PDA's controller Kenneth Strachan, used the provider number to bill Medicaid for services that PDA never actually provided. This billing scheme continued for several years, surviving Strachan's dismissal in October 1996 and continuing under Braxtonbrown–Smith's direction until 1998.

By early 1996, Braxtonbrown–Smith's personal financial needs were becoming more pronounced, as she had contracted to purchase a $400,000 house and needed to show cash in her personal account to support a down payment. She also needed funds for her wedding, honeymoon, improvements on the new house, and to support an expensive lifestyle. She would later generate and submit false income tax statements for this time period to Provident Mortgage Corporation in order to obtain a mortgage, and to Mellon Bank in order to obtain a line of credit. By the Spring of 1996, the false billings escalated. For example, in April 1996 in response to Braxtonbrown–Smith's growing personal financial needs, Strachan began submitting false claims to Medicaid representing that BTC clients were receiving psychotherapy from a psychiatrist every day, despite the fact that the clinic was not yet operational and many of BTC's clients were non-communicative and could not speak. Although alerted to billing irregularities by Arnett Smith, an employee of PDA and a former MRDDA employee, Braxtonbrown–Smith took no steps to stop the submission of false bills to Medicaid.

Braxtonbrown–Smith and Strachan together diverted over $400,000 of funds from PDA accounts for their personal use. All told, PDA's false claims totaled $1,693,708, representing approximately 30% of PDA's total Medicaid billings. Additionally, Braxtonbrown–Smith drew down her line of credit with Mellon Bank to the point that when PDA went out of business in the summer of 1998, she owed Mellon approximately $440,000.

In 1999 Braxtonbrown–Smith was indicted for conspiracy, 18 U.S.C. § 371 (Count 1); mail fraud, 18 U.S.C. § 1341 (Counts 2 & 3); tax evasion, 26 U.S.C. § 7201 (Counts 4–6); money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(ii) & 1956(a)(1)(B)(i)

(Counts 7–12); bank fraud, 18 U.S.C. § 1344 (Counts 13 & 14); and wire fraud, 18 U.S.C. § 1343 (Count 15). At trial, Braxtonbrown–Smith's evidence was confined to six character witnesses who testified regarding her reputation for truthfulness and honesty in the community. The jury convicted her on all counts except one count of mail fraud. The district court sentenced Braxtonbrown–Smith to 60 months imprisonment for conspiracy, mail fraud, tax evasion, and wire fraud, and to 87 months on the remaining counts, the sentence on each count to run concurrently. The court imposed five years of supervised release on all counts, to run concurrently as well. The district court also ordered that she make restitution payments including $2,132,484.70 (the total of her fraudulent Medicaid billings and her Mellon Bank line of credit spending), to be paid from 50% of her prison earnings and upon her release from custody at a monthly rate of "no less than $250 as directed by the probation office." The court further ordered her to arrange with the Internal Revenue Service to pay all past and present taxes, interest and penalties, and to provide proof of her filing of returns to the Probation Office.

## II.

On appeal, Braxtonbrown–Smith contends that instead of proving that any of the funds used in the alleged money laundering transactions represented the proceeds of unlawful activity, the government relied on a judicially-created presumption that any withdrawal of funds from a commingled account involves unlawful proceeds, even when the amount of legitimately earned money in the account exceeds the amount withdrawn. Because the presumption relieved the government of its burden of proof under the plain language of 18 U.S.C. § 1956(a)(1)(A), she contends that the money laundering counts must be dismissed for insufficient evidence. Failing that, she contends the jury was erroneously instructed on the unconstitutional commingling presumption, and those counts must be remanded for a new trial. Likewise, she contends that she must be granted a new trial on the conspiracy count because the jury was instructed on three alternative conspiracy objects, including money laundering, and it is impossible to determine from the general conspiracy verdict that it is not tainted by the allegedly improper money laundering instruction. In addition, she contends that she is entitled to a new trial on the conspiracy and money laundering counts because the district court's supplemental instruction on the interstate commerce element included a mandatory presumption. Finally, as to her sentence, she seeks correction of her sentences under the United States Sentencing Guidelines ("Guidelines") and contends that the restitution order impermissibly delegated the court's authority to the probation office with respect to the terms of the restitution payment and impermissibly required that she make restitution to the Internal Revenue Service by making payment of past and present federal taxes a condition of her supervised release.

### A.

Section 1956 provides, in relevant part,

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986;

. . .

shall be [subject to fine and imprisonment].

18 U.S.C. § 1956(a)(1) (2000).

Braxtonbrown–Smith focuses on the phrase "property involved" and the word "represents" in contending that the government failed to meet its burden to prove that each of her withdrawals from the PDA account at NationsBank for her personal use included funds that were diverted from Medicaid reimbursements to PDA. In other words, Braxtonbrown–Smith contends that the plain language of § 1956(a)(1) requires the government to demonstrate affirmatively that the particular illegitimate dollars were laundered and urges adoption of a presumption, based on the rule of lenity, that withdrawals from a commingled account are withdrawals of any "clean" money in the account. Although acknowledging "substantial" circuit precedent contrary to a complete tracing requirement, she maintains that the statutory language does not permit the government to rely on evidence that she personally spent money she withdrew from an account in which illegal and legitimate funds were commingled. This is because millions of dollars from legitimate Medicaid billing were in the PDA account, and hence there was a sufficient amount of legal funds in the account to cover the alleged unlawful transactions under § 1956. As an issue of statutory construction, our review is de novo. *Calloway v. District of Columbia*, 216 F.3d 1, 5 (D.C.Cir.2000) (citing *United States v. Williams–Davis*, 90 F.3d 490, 512 (D.C.Cir.1996)).

■ In construing a statute, the court begins with the plain language of the statute. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474, 112 S.Ct. 2589, 2593, 120 L.Ed.2d 379 (1992) (citing *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 603–04, 112 L.Ed.2d 608 (1991)). Where the language is clear, that is the end of judicial inquiry "in all but the most extraordinary circumstances." *Id.* Where the language is subject to more than one interpretation and the meaning of Congress is not apparent from the language itself, the court may be forced to look to the general purpose of Congress in enacting the statute and to its legislative history for helpful clues. *E.g. Santa Fe Pacific R.R. Co. v. Sec'y of Interior*, 830 F.2d 1168, 1174 (D.C.Cir.1987). In addressing Braxtonbrown–Smith's interpretation of § 1956(a)(1), it is helpful to keep in mind the Supreme Court's observation in *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), that "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words." *Id.* at 543, 60 S.Ct. at 1064 (quoting *Ozawa v. United States*, 260 U.S. 178, 194, 43 S.Ct. 65, 67–68, 67 L.Ed. 199 (1922)); *see also United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). Thus, the court must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available. *American Trucking*, 310 U.S. at 543, 60 S.Ct. at 1063–64; *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339–40, 84 L.Ed. 340 (1940).

■ Contrary to Braxtonbrown–Smith's contention, a no-tracing rule is consistent with the plain language of the statute. The broad language of the statute suffices

to reach transactions that "involve[ ]" illegal proceeds. As the Seventh Circuit observed, "money need not be derived from crime to be 'involved' in it; perhaps a particular sum is used as the bankroll facilitating the fraud." *United States v. $448,342.85,* 969 F.2d 474, 476 (7th Cir. 1992). Although "involve" might also be read to mean that the individual transaction must include illegal proceeds in some amount, no circuit to consider this issue has held that complete tracing of the sort that Braxtonbrown–Smith urges is required under § 1956(a)(1)(A).[1] *See United States v. Wilkinson,* 137 F.3d 214, 222 (4th Cir.1998); *United States v. Tencer,* 107 F.3d 1120, 1131 (5th Cir.), *cert. denied,* 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997); *United States v. Voigt,* 89 F.3d 1050, 1080–81 (3d Cir.), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *United States v. Cancelliere,* 69 F.3d 1116, 1120 (11th Cir.1995); *United States v. Bencs,* 28 F.3d 555, 562 (6th Cir.1994); *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915 (1995); *United States v. Garcia,* 37 F.3d 1359, 1365 (9th Cir.1994); *United States v. Jackson,* 935 F.2d 832, 840 (7th Cir.1991). This is a necessary result of the fungibility of money, a factor of which Congress was undoubtedly aware when it enacted § 1956(a)(1) as part of the Money Laundering Control Act, the purpose of which was to "punish transactions that are undertaken with the proceeds of crimes or that are designed to launder the proceeds of crime." H.R. Rep. No. 99–855, pt. 1, at 7 (1986); *United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395, 107

L.Ed.2d 290 (1989). The tracing of dollars emanating from a bank account (as distinct from the tracing of actual bills used in a particular cash transaction) to specific dollars deposited into a bank account is no less than "a mathematical impossibility" where, as in the instant case, "the amount of the transfer was less than the amount of untainted funds in the account." *Voigt,* 89 F.3d at 1081. To create a presumption, based on the rule of lenity, as Braxtonbrown–Smith urges that withdrawals from a commingled account are withdrawals of any "clean" money therein would come close to rendering money laundering invulnerable; a person who deposits $10,000 of dirty money in a $100,000 account could later withdraw $10,000 repeatedly without penalty so long as there were sufficient clean money in the account to cover the withdrawals. Were such a presumption required under § 1956(a)(1), Congress' purpose would be undermined because such a requirement would allow "participants in unlawful activities [to] prevent their own convictions under the money laundering statute simply by commingling funds derived from both 'specified unlawful activities' and other activities." *Jackson,* 935 F.2d at 840. This would be a nonsensical outcome in light of the fact that "[i]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *Tencer,* 107 F.3d at 1135 (citation omitted).

In contending that the plain language of § 1956(a)(1) requires the government to

---

1. The circuits have taken various approaches with regard to the amount of tracing that is required. First, some courts have held that any transaction out of a commingled account constitutes laundering. *See, e.g. United States v. Ward,* 197 F.3d 1076, 1083 (11th Cir.1999). Second, some courts have suggested that defendants will be responsible only for those transactions from a commingled account that

do not exceed the total amount of illegitimate funds. *See, e.g. United States v. Wilkinson,* 137 F.3d 214, 222 (4th Cir.1998). Finally, other courts have decided to treat spending from commingled accounts as involving "proportional fractions of clean and dirty money." *United States v. Loe,* 248 F.3d 449, 467 n. 81 (5th Cir.2001).

show complete tracing, Braxtonbrown–Smith downplays these realities about the nature of money as a fungible commodity and the unreasonable, if not absurd, results her approach would produce. Her reliance on *United States v. Wynn*, 61 F.3d 921 (D.C.Cir.), *cert. denied*, 516 U.S. 1015, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995), is misplaced, for the holding in that case did not rely on a circumstantial inference that the funds at issue represented illegal proceeds as opposed to legitimate income. In *Wynn*, the defendant maintained there was insufficient evidence that the cash used to purchase cashiers' checks used to purchase a car constituted illegal proceeds because the source laundering the funds had won $150,000 in the Maryland lottery and could have used those funds to make the purchase. *Wynn*, 61 F.3d at 926. The court did not resolve the issue of whether tracing was required to be proven by the government, although it did characterize the argument as "an uncertain legal proposition." *Id.* Instead, and fatal to Braxtonbrown–Smith's position, notwithstanding evidence of lottery proceeds, the court held that the government presented sufficient evidence from which a reasonable juror could find that the money used to purchase the cashiers' checks totaling nearly $9000 flowed directly from the major narcotics trafficking operation of the source of the funds. *Id.* Braxtonbrown–Smith's reliance on *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), is likewise misplaced; *Rutgard* involved a prosecution under § 1957, which the Ninth Circuit explicitly distinguished from § 1956, and its holding that tracing is required under § 1957 is a minority view. *See United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir.), *cert. denied*, 519 U.S. 1116, 117 S.Ct. 960, 136 L.Ed.2d 846 (1997); *United States v. Moore*, 27 F.3d 969, 976 (4th Cir.), *cert. denied*, 513 U.S. 979, 115 S.Ct. 459, 130 L.Ed.2d 367 (1994); *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir.1992).

The risk of unduly harsh consequences that Braxtonbrown–Smith maintains could occur in the absence of a tracing requirement is mitigated by the statute. Under § 1956(a)(1)(A), the government must prove that the defendant, first, knew that the transaction "represents the proceeds" of unlawful activity, and, second, intended either to promote the "carrying on of a specified unlawful activity" or "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." After multiple transactions, then, the government will have a difficult burden to prove the second intent for recent transactions based on proof of a single unlawful dollar deposited long ago.

Furthermore, there is no such harsh result in the instant case. Braxtonbrown–Smith states in her brief that the government's evidence "was simply that the challenged transactions, totaling approximately $500,000, were conducted using funds from the PDA operating account at Nations-Bank and that of the millions of dollars that went into that account, less than 30%—approximately $1.6 million—was from illegal Medicaid billings." Appellant's Br. at 13. The amount of money that the government's evidence showed was involved in the money laundering scheme is hardly minuscule. In view of the government's evidence, a reasonable juror could conclude that the bilking engaged in by Braxtonbrown–Smith was facilitated by her multitude of false Medicaid claims, which provided an influx of surplus funds in the PDA account and that these funds were "involved" in the charged transactions. *See United States v. Harrison*, 204 F.3d 236, 239 (D.C.Cir.2000). That is all the statute requires.

Accordingly, we need not decide among the various possible tracing rules, *see supra* n. 1, because it suffices for this appeal to join our sister circuits in declining to "read Congress's use of the word 'involve' as imposing the requirement that the government trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction." *Jackson,* 935 F.2d at 840. Allowing the mere commingling of legitimate funds to defeat a money laundering conviction so easily would wholly undermine Congress's intent and effectively nullify the offense.

### B.

■ Braxtonbrown–Smith's remaining contentions do not require extended discussion. First, her claims of instructional error fail. Because we reject the contention that the government was required to trace the unlawful funds in each transaction, we find no error, much less plain error (inasmuch as Braxtonbrown–Smith did not object in the district court as required by FED.R.CRIM.P. 30), in the jury instruction that proof of spending from a commingled account was sufficient to establish money laundering under § 1956. *See U.S. v. Norris,* 873 F.2d 1519, 1524 (D.C.Cir.1989) (quoting *U.S. v. Campbell,* 684 F.2d 141, 148 (D.C.Cir.1982)). Similarly, the district court did not impermissibly invade the province of the jury in instructing on the interstate commerce element of § 1956. *See United States v. Jones,* 909 F.2d 533, 538 (D.C.Cir.1990). Not only was the instruction, given in response to a note from the jury, a correct statement of the law, *see, e.g., United States v. Ladum,* 141 F.3d 1328, 1339 (9th Cir.1998); *United States v. Peay,* 972 F.2d 71, 74–75 (4th Cir.1992), it merely created a permissive inference from the evidence that did "not relieve the [government] of its burden of persuasion because it still

requires the [government] to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). Instructions must be viewed in the context of the entire instructions to the jury, *id.* at 315, 105 S.Ct. at 1971, and the district court instructed the jury that it alone was the finder of fact.

■ Second, Braxtonbrown–Smith's challenges to her sentence are, in the main, meritless. She contends for the first time on appeal that she was improperly sentenced on an offense level of 23 based on an application of § 2S1.1(a)(1) of the Guidelines because § 2S1.1(a)(1) only applies to convictions under § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A), and it is impossible to determine whether she was convicted under (A) or (B) from the jury's general verdict. *United States v. Merlos,* 8 F.3d 48, 50 (D.C.Cir.1993). The jury necessarily made the requisite finding of an intent to evade income tax when it convicted Braxtonbrown–Smith of tax evasion under 26 U.S.C. § 7201. The evasive acts underlying § 7201 charged in the indictment are identical to those that form the basis of the money laundering charges under § 1956(a)(1)(A). *See United States v. Smart,* 98 F.3d 1379, 1392–93 (D.C.Cir. 1996). Nor can she show that the district court erred in considering the total amount of money involved in the charged transactions—$487,290.78—rather than only some portion of that amount based on the proportion of illegitimate funds in the PDA account in calculating the value of the laundered funds for under § 2S1.1(b)(2) of the Guidelines. "Section 2S1.1 measures the harm to society that the money laundering causes to law enforcement's efforts to detect the use and production of ill-gotten gains," *United States v. Allen,* 76 F.3d 1348, 1369 (5th Cir.), *cert. denied,* 519

U.S. 838, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996), and Braxtonbrown–Smith cites no authority for her claim of entitlement to a pro-rata calculation. Indeed, those circuits that have considered the question are to the contrary. *United States v. Owens,* 159 F.3d 221, 229 (6th Cir.1998), *cert. denied,* 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999); *Allen,* 76 F.3d at 1369; *United States v. Thompson,* 40 F.3d 48, 52 (3d Cir.1994). Additionally, the district court did not clearly err in grouping, for purposes of § 3D1.2(b) of the Guidelines, the fraud counts (bank, mail, and wire) separately from the money laundering and tax evasion counts given the district court's finding that there were different victims (the Mellon Bank, the D.C. Medicaid Fund, and the society at large). *See United States v. Kim,* 23 F.3d 513, 517 (D.C.Cir.1994); *United States v. Napoli,* 179 F.3d 1 (2d Cir.1999). *United States v. Cusumano,* 943 F.2d 305 (3d Cir.1991), on which Braxtonbrown–Smith relies, is not to the contrary as that case did not involve fraud counts or involve an express finding of different victims.

 However, as the government concedes on appeal, the district court erred in sentencing Braxtonbrown–Smith to 5 years of supervised release on all counts; counts 1, 3–12, and 15 are either Class C or Class D felonies subject to 3 years of supervised release. 18 U.S.C. § 3583(b)(2) (2000). Accordingly, we remand the case to the district court to correct the judgment. In addition, assuming ambiguity in the restitution order, on remand the district court shall clarify that the phrase "not less than $250 as directed by the probation office" does not give the Probation Office authority to modify the monthly amount of restitution that Braxtonbrown–Smith is required to make upon release from custody. *United States v. Pandiello,* 184 F.3d 682, 688 (7th Cir. 1999); *United States v. Johnson,* 48 F.3d 806, 808–09 (4th Cir.1995). On remand the district court shall also strike from the judgment the special condition regarding her participation in a mental health treatment program for anger control that appears to have been inadvertently carried over from another case. Finally, Braxtonbrown–Smith's contention that the district court's order to pay back taxes was an improper restitution order is meritless as her obligation to pay back taxes is established by the relevant provisions of the Internal Revenue Code.

Accordingly, we remand the case to the district court for correction of Braxtonbrown–Smith's sentence; otherwise we affirm the judgment of conviction.