**UNITED STATES of America,
Plaintiff,**

v.

**Thomas E. PARENTEAU, Defendant.**

**Case No. 2:08–cr–180(1).**

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 19, 2011.

---

Richard M. Rolwing, Department of Justice, Tax Division, Columbus, OH, for Plaintiff.

Terrence Austin Grady, Katherine R. Herron, Terrence A. Grady & Associates Co. LPA, Columbus, OH, for Defendant.

## PRELIMINARY ORDER OF FORFEITURE

MICHAEL H. WATSON, District Judge.

Defendant Thomas E. Parenteau ("Defendant" or "Parenteau") stands convicted of several offenses. The Government now moves for a preliminary order of forfeiture. ECF No. 282. For the following reasons the Court grants the Government's motion.

## I. BACKGROUND

The Grand Jury returned the Second Superceding Indictment on June 17, 2009, charging Parenteau and others with various offenses. ECF No. 96. The Second Superceding Indictment included a forfeiture count against Parenteau, which states:

COUNT FIFTEEN

(Forfeiture Allegations)

MONEY LAUNDERING

104. As a result of the violation(s) in each of Count Two, Count Four, Count Five, Count Six, Count Seven, Count Eight, Count Eleven, Count Twelve, Count Thirteen, and Count Fourteen, under 18 U.S.C. § 982(a)(1), the defendant, THOMAS E. PARENTEAU, shall forfeit to the United States:

A. All right, title, and interest in any property, real or personal, involved in a transaction or attempted transaction or offense in violation of 18 U.S.C. §§ 1956 and 1957 or conspiracy to commit such offenses, for which the defendant is convicted, and all property traceable to such property, including the following;

(1) All money or other property that was the subject of each transaction, transportation, transmission, or transfer in violation of §§ 1956 and 1957;

(2) All commissions, fees, and other property constituting proceeds obtained as a result of those violations; and

(3) All property used in any manner or part to commit or to facilitate the commission of those violations.

and also including, but not limited to, the following:

(4) Flexible Premium Universal Life Insurance Policy # 4091515 issued by Principle Life Insurance Company;

(5) Flexible Premium Universal Life Insurance Policy # 4093606 issued by Principle Life Insurance Company;

(6) Flexible Premium Adjustable Life Insurance Policy # 3005591K issued by ReliaStar Life Insurance Company;

(7) Manulife Universal Life 2002 Life Insurance Policy # 59099309 issued by Manulife Financial (John Hancock);

B. A money judgment for a sum of money equal to at least $22,511,718, or the total amount of money involved in each offense, or conspiracy to commit such offense, for which the defendant is convicted. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

SPECIFIED UNLAWFUL ACTIVITY PROCEEDS

105. As a result of the violation(s) in Count Three, under 18 U.S.C. § 982(a)(2)(A), the defendant, THOMAS E. PARENTEAU, shall forfeit to the United States: any property, real or personal, which constitutes or is derived from proceeds he obtained directly or indirectly, as a result of any violation of 18 U.S.C. § 1349, including, but not limited to, the following:

(A) The death benefit/proceeds of the following life insurance policies:

(i) Flexible Premium Universal Life Insurance Policy # 4091515 issued by Principle Life Insurance Company;

(ii) Flexible Premium Universal Life Insurance Policy # 4093606 issued by Principle Life Insurance Company;

(iii) Flexible Premium Adjustable Life Insurance Policy # 3005591K issued by ReliaStar Life Insurance Company;

(iv) Manulife Universal Life 2002 Life Insurance Policy # 59099309 issued by Manulife Financial (John Hancock);

and (B) A money judgment for a sum of money in United States currency equal to the proceeds he obtained as a result of the violation.

SUBSTITUTE ASSETS

106. If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above, including any insurance proceeds from the above listed policies. All in accordance with Title 18, United States Code, Section 982(a)(1) and Rule 32.2(a), Federal Rules of Criminal Procedure.

Second Superceding Indictment ¶¶ 104–106, ECF No. 96.

Several counts are relevant to the Government's motion for a preliminary order of forfeiture. First, Count Two charged Parenteau with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). It accused Parenteau of conspiracy to commit money laundering by conducting transactions involving the proceeds of the specified unlawful activity, to perpetuate loan application fraud, to promote the fraud and to conceal and disguise the fraud proceeds. In essence, Parenteau and his co-conspirators created false documentation to obtain fraudulent loans on the 4500 Dublin Road property. The loan proceeds were deposited in bank accounts, including account number 3049. Money from account number 3049 was then used to make premium payments of about $20,000 per month on key man life insurance policies Parenteau had obtained on his father, Roger Parenteau. Count Three, the Specified Unlawful Activity ("SUA"), charged Parenteau with conspiracy to commit bank and wire fraud, and specifically loan application fraud, in violation of 18 U.S.C. § 1349. Count Three entailed a scheme to sell eight homes and three condominium buildings at inflated prices, using part of the loan proceeds to pay kickbacks to the buyers. Counts Five, Six, Seven, Eight, Eleven, Twelve, Thirteen, and Fourteen charged Parenteau

with specific substantive money laundering transactions relating to the home sales set forth in Count Three.

Parenteau, represented by counsel, pleaded not guilty to all of the charges. The matter proceeded to trial. On the first day of the trial, Parenteau knowingly and voluntarily waived his right to counsel and opted to represent himself. Appointed standby counsel were available to Parenteau throughout the trial, which lasted eight weeks. Before the jury began deliberating, Parenteau waived his right to have the jury determine the forfeiture count, electing instead to allow the Court to decide the matter. *See* Fed.R.Crim.P. 32.2(5)(A). On July 3, 2010, the jury returned verdicts finding Parenteau guilty on: Count One, conspiracy to defraud the United States; Count Two, conspiracy to commit money laundering; Count Three, conspiracy to commit wire and bank fraud; Counts Four, Five, Six, Seven, Eight, Eleven, and Twelve, money laundering; and Count Eighteen, conspiracy to commit obstruction of justice or witness tampering. The jury acquitted Parenteau on two of the money laundering counts, Counts Thirteen and Fourteen.

The Government filed its motion for a preliminary order of forfeiture on September 3, 2010, seeking three forms of relief: (1) forfeiture of any interest Parenteau has in four key man life insurance policies on his father Roger Parenteau, including death benefit proceeds, returned premiums, or interest earned or payable; (2) a money judgment of at least $20,464,537 for the amount of fraudulently acquired funds involved in, or used to commit the money laundering offenses; and (3) a money judgment of $18,613,396 for the gross proceeds obtained in the conspiracy to commit bank and wire fraud, excluding proceeds laundered in Counts 4–8 and 11–12 to avoid double counting. ECF No. 282.

The Court conducted a hearing on the Government's Motion for a preliminary order of forfeiture on February 10 and 11, 2011. The Government presented the testimony of Agent Erik Stevenson. Agent Stevenson reiterated the basic facts of the case with an emphasis on the role of the insurance policies in the money laundering conspiracy. Specifically, Stevenson testified that over $5 million in proceeds from the money laundering offenses was used to pay the premiums on the life insurance policies. Hr'g Tr. 53. The policies, in turn, were used to borrow more money. *Id.* Agent Stevenson stated that the life insurance policies made it easier for Parenteau to commit money laundering. *Id.* In addition, Parenteau deposited the money obtained through loans against the insurance policies into his account to give the appearance that he had an income of $600,000 per month. Hr'g Tr. 54. Parenteau represented the $600,000 per month as income in his application for the $12 million loan from Century Bank. *Id.*

Parenteau offered the testimony of Matthew Gutzwiller, a CPA and forensic examiner Parenteau retained as an expert to examine his bank accounts. Hr'g Tr. 10910. Parenteau's purpose for offering Gutzwiller's testimony was to suggest that he had substantial income not related to money laundering or bank and wire fraud. Gutzwiller testified, *inter alia,* that $89 million was deposited into Parenteau's bank accounts during the relevant period of 2004 through 2008. He also indicated Parenteau received about $13.7 million in revenue from his business activities. Hr'g Tr. 114.

Gutzwiller conceded, however, that his review of deposits did not take into account the transfer of money back and forth between accounts. Hr'g Tr. 114, 141, 144. Moreover, on cross-examination, Gutzwiller acknowledged that he was unaware

that four of the top ten transactions comprising the $13.7 million were sales of homes to Parenteau's family members. Hrg Tr. 125–26. Gutzwiller apparently was also unaware that for some of the transactions, Parenteau booked more revenue than he received. Hr'g Tr. 128–31. Moreover, Gutzwiller did not attempt to trace the $13.7 million in its entirety into the 3049 bank account, or to payments Parenteau made on the life insurance policies. Hr'g Tr. 132. Further, Gutzwiller conceded he did not perform an expense analysis, and was therefore unable to determine the amount of cash available to Parenteau to pay the life insurance premiums. Hr'g Tr. 134, 137, 139, 150.

On rebuttal, Agent Stevenson indicated that absent the fraudulent loans proceeds, Parenteau did not have sufficient funds to pay the premiums on the life insurance policies. Hr'g Tr. 156. Stevenson testified that he performed an expense analysis which indicated that from 2004 to 2008, Parenteau had available only $446,000 of legitimate funds to pay all of his expenses, including life insurance premiums. Hr'g Tr. 163, 166.

Following the hearing on the motion for a preliminary order of forfeiture, the parties filed a stipulation with respect to the money judgments sought by the Government. Stipulation, ECF No. 344. Specifically, the parties agreed that the Court shall impose money judgments against Parenteau in the amounts of $9,747,741.96 for Counts Four through Eight, and Eleven and Twelve, and $5,233,474.08 on Count

Three, for a total money judgment of $14,981,216.04. *Id.*

## II. DISCUSSION

At this juncture, the Government's motion for a preliminary order of forfeiture requires the Court to resolve two issues. First, the Court must determine whether the requested forfeiture constitutes an excessive fine in violation of the Eighth Amendment to the United States Constitution. Second, the Court must decide whether, and to what extent, the Government is entitled to forfeiture of Parenteau's interest in the key man life insurance policies on his deceased father, Roger Parenteau.[1]

### A. Excessive Fine

■ The Government seeks forfeiture of Parenteau's interest in the four key man life insurance policies with a potential value of about $23 million, as well as money judgments totaling $14,981,216.04. Parenteau argues that the relief the Government requests would violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. The Sixth Circuit Court of Appeals recently elaborated on the standard applicable to alleged violations of the Excessive Fines Clause:

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. We adhere to the "narrow proportionality principle" announced in *Harmelin v. Michigan,* 501 U.S. 957, 996–1009, 111 S.Ct. 2680,

---

1. Parenteau also initially argued that the Government's forfeiture claim concerning the key man life insurance must be rejected because the Government failed to include the premiums in Count 15. That argument fails under the plain language of Fed. R. of Crim. P. 32.1(a), which provides "The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." In addition, Parenteau raised a double-counting argument, which was resolved when the parties entered a stipulation as to the amount of a money judgment. *See* Stipulation, ECF No. 344.

115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). *United States v. Hughes,* 632 F.3d 956, 959 (6th Cir.2011); [*United States v.*] *Graham,* 622 F.3d [445] 452–53 [ (6th Cir. 2010) ]; [*United States v.*] *Jones,* 569 F.3d [569,] 573 [ (6th Cir. 2009) ]. "Under this approach, there is no requirement of strict proportionality; the [E]ighth [A]mendment is offended only by an extreme disparity between crime and sentence." [*United States v. Jones* ], 569 F.3d at 573 (citation and internal quotation marks omitted). "A defendant challenging his sentence under the Eighth Amendment has a tremendously difficult burden to meet." *Hughes,* 632 F.3d at 959.

Specifically, with regard to fines, " '[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish.' " *United States v. Madison,* 226 Fed.Appx. 535, 548 (6th Cir.2007) (unpublished) (quoting *United States v. Bajakajian,* 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)). A punitive fine violates the Excessive Fines Clause if it is "grossly disproportional" to the gravity of the offense. *Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028; *United States v. Blackwell,* 459 F.3d 739, 771 (6th Cir.2006). Relevant factors to consider include the nature of the offense and its relation to other criminal activity, the potential fine under the advisory Guidelines range, the maximum sentence and fine that could have been imposed, and the harm caused by the defendant's conduct. *United States v. Varrone,* 554 F.3d 327, 331 (2d Cir. 2009); *United States v. Ely,* 468 F.3d 399, 403 (6th Cir.2006); *United States v. Bollin,* 264 F.3d 391, 417–18 (4th Cir. 2001).

*United States v. Zakharia,* 418 Fed.Appx. 414, 421–22 (6th Cir.2011).

The leading decision, *Bajakajian,* is illustrative. 524 U.S. 321, 118 S.Ct. 2028. There, the defendant attempted to leave the United States without reporting that he was transporting more than $10,000, $357,144 to be exact, in currency. The defendant was convicted and the district court found the entire $357,144 was subject to forfeiture because it was " 'involved in the offense.' " *Id.* at 325–26, 118 S.Ct. 2028. Nonetheless, the district court found the amount was grossly disproportionate to the offense, and would therefore violate the Excessive Fines Clause. The Government appealed, and the Ninth Circuit affirmed.

The Supreme Court affirmed the judgment of the Ninth Circuit. *Id.* at 344, 118 S.Ct. 2028. The Court observed:

Respondent's crime was solely a reporting offense. It was permissible to transport the currency out of the country so long as he reported it. Section 982(a)(1) orders currency to be forfeited for a "willful" violation of the reporting requirement. Thus, the essence of respondent's crime is a willful failure to report the removal of currency from the United States. Furthermore, as the District Court found, respondent's violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt. Whatever his other vices, respondent does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader.

. . . .

The harm that respondent caused was also minimal. Failure to report his currency affected only one party, the Government, and in a relatively minor way.

There was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.

*Id.* at 337–38, 339, 118 S.Ct. 2028 (footnote omitted). On those bases, the Court concluded that the forfeiture of $357,144 would violate the Excessive Fines Clause. *Id.* at 337, 118 S.Ct. 2028.

The Court will first consider the seriousness of the offenses. Here, in contrast to *Bajakajian,* Parenteau was convicted of, *inter alia,* conspiracy to commit money laundering, a Class C felony, conspiracy to commit bank and wire fraud, a Class B felony, and several substantive counts of money laundering, Class C felonies. As such, Parenteau "fit[s] into the class of persons for whom the [forfeiture] statute was principally designed." *Bajakajian,* 524 U.S. at 338, 118 S.Ct. 2028. The offenses are serious, and weigh against a finding that the requested forfeiture violated the Eighth Amendment.

The Court will also examine "the potential fine under the advisory Guidelines range...." *Zakharia,* 418 Fed.Appx. at 422. Parenteau argues that the potential fine under the Guidelines is limited to $25,000 to $1.5 million. The Guidelines, however, provide that the limitation Parenteau invokes does not apply where, as here, the defendant was convicted under a statute authorizing a maximum fine greater than $250,000. U.S.S.G. § 5E1.2(c)(4); *Id.* app. 5. In that instance, the Guidelines direct that "the court may impose a fine up to the maximum authorized by statute." U.S.S.G. § 5E1.2(c)(4). In the instant case, by statute, the maximum sentence for conspiracy to commit money laundering is twenty years imprisonment, and the

maximum fine is the greater of $500,000 or twice the value of the property involved in the offense. 18 U.S.C. § 1956(a)(1). For conspiracy to commit bank and wire fraud, the maximum sentence is thirty years imprisonment and the maximum fine is $1,000,000 or, in the alternative, twice the gross gain or gross loss. 18 U.S.C. §§ 1343, 1344, 3571(d).

The parties have stipulated money judgments totaling $14,981,216.04. It follows that the maximum statutory fine for the offenses would be twice that amount, or $29,962,432.08. The Government seeks forfeiture of the life insurance policies, which are potentially worth about $23 million, plus the total money judgment of about $15 million. Hence, the total forfeiture sought is approximately $38 million. That figure is not so far in excess of the maximum fine as to be indicative of an excessive fine. *See United States v. Wallace,* 389 F.3d 483, 486–87 (5th Cir.2004) (forfeiture of $30,000 airplane not grossly disproportionate to $15,000 statutory maximum fine); *cf. Varrone,* 554 F.3d at 332 (forfeiture totaling forty times the statutory range weighed in favor of finding violation of the Excessive Fines Clause).

Lastly, the Court will examine "the harm caused by the defendant's conduct." *Zakharia,* 418 Fed.Appx. at 422. Parenteau's criminal conspiracies caused widespread and significant harm to financial institutions and numerous individuals. Perhaps the most poignant example is Mary James, an aunt of Todd Gongwer's wife, Kate Baker Gongwer. James, a teacher who earned a modest salary, was the innocent victim of loans fraudulently obtained for the purchase of 10151 Windsor Way orchestrated by Parenteau and Todd Gongwer.[2] Gongwer and his wife

---

**2.** The 10151 Windsor Way property was the subject of three counts for which Parenteau was convicted: Counts Three, Eleven, and Twelve.

opened a bank account in James' name, obtained her power of attorney, and then purchased the property in James' name. As was typical of Parenteau's schemes, the property was sold at a grossly inflated price through the use of fictitious work change orders, and Gongwer received kickbacks of nearly $1 million. The property ultimately went into foreclosure, resulting in a loss of $1.38 million to Chase Bank, and $500,000 to American Home Mortgage. James was not aware of the illegal activity, and her credit rating, which had been favorable, was ruined. Her rating was still in shambles when she testified at Parenteau's trial. As a result of her low credit rating, James had to live with her daughter and her daughter's four children in their two bedroom, one bathroom apartment until September 2008, when she finally was able to convince a person who reviewed her rental application that her low credit rating was the result of identity theft. The cold, dry record of James' testimony falls far short of conveying the genuine and justified sense of shock and betrayal James expressed as she testified. And she was but one of the victims of Parenteau's conspiracies. It is also notable that Parenteau's fraudulent conduct likely contributed to the failure of Century Bank. The Court finds that the extensive harm Parenteau's crimes caused weighs against finding a violation of the Excessive Fines Clause.

Considering the factors together, the Court finds that the seriousness of Parenteau's offenses, the relative parity between the potential maximum fine and the forfeiture sought by the Government, and the degree of harm Parenteau's crimes occasioned all weigh against a finding that the forfeiture the Government seeks is grossly disproportionate to the gravity of Parenteau's offenses. Accordingly, the Court holds that the forfeiture sought does not violate the Eighth Amendment's Excessive Fines Clause.

## B. Key Man Life Insurance Policies

As indicated above, the Government seeks forfeiture of any interest Parenteau has in four key man life insurance policies on his father, Roger Parenteau. Parenteau and the Government agree the premium payments were made with commingled funds from account number 3049. They disagree, however, on the legal significance of the fact that account number 3049 contained both tainted and untainted funds.

Parenteau argues that prior to February 2, 2004, the date of the first criminal conduct alleged in the Second Superceding Indictment, he used untainted money to pay the premiums of the policies. Specifically, Parenteau maintains that seventeen percent of the total premiums were paid with untainted funds. Parenteau contends that to obtain a conviction for money laundering under 18 U.S.C. § 1957, the Government bears the burden of tracing each alleged monetary transaction to criminally-derived funds. In support of that proposition, Parenteau relies primarily upon *United States v. Rutgard*, 116 F.3d 1270 (9th Cir.1997). The holding in *Rutgard* was based upon a distinction between § 1956 and § 1957 offenses. *See* 116 F.3d at 1290–1293. The court observed that § 1956 includes broad terms referring to transactions which "involved" the proceeds of a specified unlawful offense with knowledge that the transaction "is designed in whole or in part" to conceal the proceeds. *Rutgard*, 116 F.3d at 1291–92. In contrast, § 1957 does not contain such broad language. *Id.* The court opined that decisions indicating that the government was not required to trace commingled funds with respect to § 1956 offenses therefore should not be applied to cases involving

offenses charged under § 1957. *Id.* at 1292.

Parenteau's reliance on *Rutgard* is misplaced for several reasons. First and foremost, the portions of the *Rutgard* opinion upon which Parenteau relies addressed a sufficiency of the evidence claim, not the standard to determine whether property is subject to forfeiture. In determining forfeiture, the Court is bound not by the standard to review the sufficiency of the evidence, but by the nexus requirements set forth in the forfeiture statute. *See* Fed.R.Crim.P. 32.2(b)(1)(A); 18 U.S.C. § 982(a)(1) and (2).

In addition, despite Parenteau's assertion to the contrary, he was, in fact, convicted on Count Two for conspiracy to commit money laundering under § 1956. Indeed, in his briefs Parenteau mischaracterizes the jury instructions for Count Two, as he appears to suggest they instructed only on § 1957 offenses. Although the specific premium payments were charged as a conspiracy to commit individual violations of § 1957, the instructions also unmistakably set forth the elements of a conspiracy to commit money laundering involving the proceeds of a specified unlawful activity, namely, loan application fraud, in violation of § 1956(a). *See* Final Jury Instructions 30–35, ECF No. 258. Count Two, and the jury instructions, contain the elements of conspiracy to commit promotion money laundering under § 1956(a)(1)(A)(i), conspiracy to commit concealment money laundering under § 1956(a)(1)(B)(i), as well as conspiracy to violate § 1957. Hence, even if *Rutgard* applied, the Government may establish the requisite nexus between the conspiracy to violate § 1956(a)(1) and the life insurance policies, regardless of whether tracing is required for the conspiracy to violate § 1957.

Furthermore, as the Government notes, the Sixth Circuit has not adopted the *Rutgard* distinction between § 1956 and § 1957 offenses even for purposes of evaluating the sufficiency of the evidence. *See United States v. Jamieson*, 427 F.3d 394, 403–04 (6th Cir.2005). Other circuits have expressly declined to follow *Rutgard*. *See, e.g., United States v. Haddad*, 462 F.3d 783, 792 (7th Cir.2006); *United States v. Davis*, 226 F.3d 346, 357 (5th Cir.2000). For the above reasons, the Court finds that *Rutgard* is inapposite.[3] Having so found, the Court will proceed to determine whether the Government has established the requisite nexus.

The law governing federal criminal forfeiture has been described as " 'labyrinthine' " and " 'complex.' " *United States v. Nicolo*, 597 F.Supp.2d 342, 344 (W.D.N.Y.2009) (quoting Heather J. Garretson, *Federal Criminal Forfeiture: A Royal Pain in the Assets*, 18 S. Cal. Rev. L. & Soc. Just., 45, 46, 48 (Fall 2008)). The starting point of the analysis is Federal Rule of Criminal Procedure 32.2(b)(1)(A), which provides in pertinent part:

> [T]he court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

---

**3.** Parenteau's reliance on *United States v. Genova*, 333 F.3d 750, 763 (7th Cir.2003) is similarly to no avail. *Genova* concerned forfeiture under RICO, which applies a narrower standard than 18 U.S.C. § 982(a)(1).

Fed.R.Crim.P. 32.2(b)(1)(A). Forfeiture is part of sentencing, and the Government therefore bears the burden of establishing the requisite nexus by a preponderance of the evidence. *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir.2010). For the same reason, the Federal Rules of Evidence do not apply to criminal forfeiture proceedings. *See United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir.2007).

With respect to money laundering, the relevant criminal forfeiture statute provides:

> The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1). Thus, the requisite nexus for money laundering is property "involved in" the offense, or property "traceable to" that property. *Id.*

■■■■■■ Courts have consistently held that the term "involved in" in § 982 must be interpreted broadly. *See Varrone*, 554 F.3d at 330–31; *United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir.2009); *United States v. Morris*, No. 6:09–16–S–DCR, 2010 WL 1049936, at *2 (E.D.Ky. Mar. 19, 2010); *Nicolo*, 597 F.Supp.2d at 347–48. Property "involved in" the offense includes property " 'involved in, used to commit, or used to facilitate the offense.' " *Seher*, 562 F.3d at 1369 (quoting *Varrone*, 554 F.3d at 331).

> "Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." [*United States v. Huber*, 404 F.3d 1047,] 1060 [ (8th Cir. 1998) ] (quoting *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir.1998)). Although " 'the mere pooling or commingling of tainted and un-

tainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture[,]' ... [f]orfeiture of commingled funds ... is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir.2003) (quoting [*United States v.*] *Bornfield*, 145 F.3d [1123,] 1135 [10th Cir. 1998] ). Indeed, in many cases "[i]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1353 (D.C.Cir.2002) (quoting [*United States v.*] *Tencer*, 107 F.3d [1120,] 1135 [ (5th Cir. 1997) ] ).

*Nicolo*, 597 F.Supp.2d at 351; *see also Seher*, 562 F.3d at 1368. Property is also forfeitable if it is "traceable to" property involved in the money laundering offense. 18 U.S.C. § 982(a)(1). "[P]roperty 'traceable to' means property ... the acquisition [of which] is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir.1998).

> We hold that the term "traceable to" means exactly what it says. In light of our holding on the burden of proof, this means that the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has *some* nexus to the property "involved in" the money laundering offense. For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant pur-

chased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

*United States v. Voigt,* 89 F.3d 1050, 1084–87 (3d Cir.1996) (footnote omitted, emphasis in original).

■ With respect to bank and wire fraud, the criminal forfeiture statute provides in pertinent part:

The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate—

(A) section ..., 1343, or 1344 of this title, affecting a financial institution, ...

shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

18 U.S.C. § 982(a)(2). The "constituting, or derived from" nexus requirement for bank and wire fraud is narrower than that for money laundering. *See United States v. Warshak,* 631 F.3d 266, 332–33 (6th Cir.2010) (applying § 982(a)(2), and rejecting argument that certain sales were legitimate and should be excluded from forfeiture, but only because *all* of the sales resulted from a conspiracy to commit fraud).

■ Applying the above principles, the Court finds that the key man life insurance policies were involved in the conspiracy to commit money laundering as charged in Count Two. In particular, the Court finds that the life insurance policies were used to commit the conspiracy to conduct financial transactions involving the proceeds of the loan application fraud, as well as to facilitate and conceal those offenses. Indeed, the role the life insurance policies played in Parenteau's criminal activity cannot be understated: the life insurance policies were instrumental to all of Parenteau's criminal activities.

With respect to the conspiracy to commit money laundering, Parenteau used the policies to commit, facilitate and disguise or conceal his criminal activities in at least two ways. First, Parenteau used the laundered proceeds of the loan application fraud to pay premiums on the policies, and then removed the funds in the form of loans from the policies, which he then deposited into his accounts to falsely give the appearance of income when applying for loans, which in turn allowed him to continue to commit further loan application fraud and additional money laundering transactions. The same chain of criminal activity served to disguise or conceal the laundered funds. Second, Parenteau listed the cash value of the policies on some of the fraudulent loan applications as the most prominent asset he owned. In fact, Parenteau was able to use the polices in these two distinct manners by carefully timing the loans from the policies and repayments of those loans. That is, Parenteau obtained letters from his insurance agent opining as to the value of the market policies on those limited occasions when the policy loans were paid up.

Based on the evidence adduced at trial, as well as the evidence submitted at the hearing on the Government's motions for an order of preliminary forfeiture, the Court finds that the Government has demonstrated by a preponderance of the evidence that substantial proceeds of the money laundering offenses charged in Count Two were commingled with some untainted funds used to pay the premiums on the key man life insurance policies. Specifically, the Court finds by a preponderance of the evidence that over $5 million in proceeds from the money launder-

ing offenses was used to pay the premiums on the life insurance policies. In addition, the Government has proven by a preponderance of the evidence that but for the laundered money, Parenteau could not have afforded to continue to pay the premiums on the policy, since Parenteau's available legitimate income during the period of 2004 to 2008 was insufficient to meet all of his expenses and pay the premiums.

Furthermore, the Court holds that the Government has shown by a preponderance of the evidence that the key man life insurance policies were integrally "involved in" the offenses charged in Count Two because the policies were used to commit, facilitate, and disguise or conceal those money laundering offenses. Since the Government has shown the policies were involved in the offenses in those fashions, the policies are forfeitable in their entirety, regardless of whether some untainted funds were used to pay the premiums. *Seher*, 562 F.3d at 1368; *Bornfield*, 145 F.3d at 1135; *Tencer*, 107 F.3d at 1134–35.

Having determined that the life insurance policies were involved in the money laundering offenses, the Court declines to reach whether they were also "traceable to" money laundering or "constituting, or derived from" the loan application fraud charged in Count Three.

## III.  DISPOSITION

Based on the above, the Court **GRANTS** the Government's motion for a preliminary order of forfeiture.  ECF No. 282.

Accordingly, the Court preliminarily orders forfeiture as follows:

### A.  Money Judgments

In accordance with the parties' stipulation, ECF No. 344, the Government is entitled to money judgments against Defendant Thomas E. Parenteau in the amount of $9,747,741.96 for Counts Four through Eight, and Eleven and Twelve, and in the amount of $5,233,474.08 for Count Three, for a total money judgment of $14,981,216.04.

### B.  Forfeiture of Key Man Life Insurance Policies

Defendant Thomas E. Parenteau shall forfeit to the Government all of his interest in the following life insurance policies:

1. Flexible Premium Universal Life Insurance Policy # 4091515 issued by Principle Life Insurance Company;

2. Flexible Premium Universal Life Insurance Policy # 4093606 issued by Principle Life Insurance Company;

3. Flexible Premium Adjustable Life Insurance Policy # 3005591K issued by ReliaStar Life Insurance Company;

4. Manulife Universal Life 2002 Life Insurance Policy # 59099309 issued by Manulife Financial (John Hancock);

The Court will determine at a later date whether to require the insurance companies to deposit the entire death benefit/proceeds of, or the premiums paid on, the policies with the Clerk of Court.

**IT IS SO ORDERED.**